# IN THE COURT OF APPEALS OF IOWA

No. 25-0172
Filed December 3, 2025

**KEVIN KOELLER,**
        Plaintiff-Appellant/Cross-Appellee,

**vs.**

**CARDINAL LOGISTICS MANAGEMENT CORPORATION and ACE AMERICAN INSURANCE COMPANY,**
        Defendants-Appellees/Cross-Appellants.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

An employee appeals and an employer cross-appeals from the district court order on judicial review affirming an award of workers' compensation benefits. **AFFIRMED.**

Joseph S. Powell (argued) of Thomas J. Reilly Law Firm, P.C., Des Moines, for appellant/cross-appellee.

Patrick J. Mack (argued) of Hennessy & Roach, P.C., Omaha, Nebraska, for appellees/cross-appellants.

Heard at oral argument by Chicchelly, P.J., and Buller and Langholz, JJ.

**CHICCHELLY, Presiding Judge.**

Kevin Koeller appeals and Cardinal Logistics Management Corporation (Cardinal) cross-appeals the district court's judicial review order, which affirmed the workers' compensation commissioner's award of benefits. Both Koeller and Cardinal challenge the award of permanent partial disability benefits. Cardinal also challenges an award of alternate medical care. Because the record supports the agency's award of permanent partial disability benefits and alternate medical care for Koeller's injuries, we affirm.

**I. Background Facts and Proceedings.**

Koeller was working as a delivery driver for Cardinal on October 5, 2022, when he was injured while attempting to open a rollup door. As Koeller explained at the arbitration hearing, "I went and pulled on it really hard with my left hand. The door didn't budge, but my shoulder did." Koeller felt a popping sensation and sharp pain. He reported the incident to Cardinal later that day but did not seek medical treatment until bruising appeared on his shoulder later that week.

On October 19, Koeller was evaluated at Finley Occupational Health by Peggy Barton, a nurse practitioner. Barton noted that the bruise was still visible on Koeller's left shoulder and his entire upper arm appeared swollen. Koeller reported constant "pain, tingling, numbness located in the left A-C joint, left deltoid, left shoulder" that intensified when he lifted his arm. An x-ray taken that day showed moderate AC joint osteoarthritis. An MRI performed on November 3 showed partial tearing of the supraspinatus tendon, insertional tendinopathy of the subscapularis tendon, and mild to moderate AC joint degenerative disease.

On December 9, Koeller was seen by Dr. Kevin Bollier, an orthopedic surgeon at the University of Iowa Hospitals and Clinics. Dr. Bollier states in his notes from that visit:

> To the nearest degree of medical certainty, the work injury was a significant factor in our causation assessment regarding the MRI findings and diagnosis. Has a consistent mechanism of injury, clear tear on the MRI, and reports no left shoulder pain prior to the work injury. Imaging including MRI shows pathology that correlates with his physical exam.

Dr. Bollier recommended conservative treatment, including shoulder injections and physical therapy, but Koeller reported that those treatments did not help when he returned for a follow-up appointment on January 9. Koeller agreed to undergo surgery: a left shoulder arthroscopy with SLAP repair, extensive debridement, biceps tenotomy, subacromial decompression, and distal clavicle excision. Dr. Bollier performed the procedure in February 2023.

When Koeller followed up with Dr. Bollier in March 2023, his overall shoulder pain was improving but the numbness that began after his work injury was unchanged. In notes from the May 2023 appointment, Dr. Bollier states: "EMG didn't show any brachial plexus pathology. Not sure what to make of this. May need to be checked out down the road if it doesn't improve." Dr. Bollier assigned Koeller a permanent partial impairment rating of 6% of the upper extremity based on loss of range of motion:

> We used a hand-held goniometer to measure shoulder [range of motion]. This rating is the result of loss of forward flexion (2% upper extremity) and extension (1% upper extremity) per figure 16-40 on page 478, loss of abduction (1% upper extremity) and adduction (0%

upper extremity) per figure 16-43 on page 477, loss of internal rotation (2% upper extremity) per figure 14-46.[1]

Dr. Bollier did not assign any additional impairment for Koeller's distal clavicle resection, finding it was not caused by the work injury.

In August 2023, Koeller underwent an independent medical evaluation with Dr. Mark C. Taylor, who is board-certified in occupational medicine. Dr. Taylor reviewed nearly 700 pages of medical records in addition to conducting a physical examination of Koeller. In a September 2023 report, Dr. Taylor diagnosed Koeller with "[l]eft shoulder labral tear, rotator cuff fraying and tendinosis, biceps tendinopathy, and AC joint arthropathy," "[l]eft shoulder and upper extremity paresthesias/dysesthesias," and "EMG evidence of disorder of the median nerve proximal to the elbow versus brachial plexus etiology." Dr. Taylor assigned Koeller a 19% impairment to the left upper extremity based on loss of range of motion (9%), the distal clavicle excision (10%), and "slight to mild weakness of supination, which is an elbow/forearm movement" (1%).

Dr. Taylor noted his impairment rating was "significantly higher" than Dr. Bollier's primarily because he found Koeller's distal clavicle excision resulted from the work injury.

> But for the work injury, Mr. Koeller would not have required a distal clavicle excision at the time that he did. When he first met with ARNP Barton, she identified tenderness over the AC joint. Also, when he first met with Dr. Bollier, Dr. Bollier identified tenderness over the AC joint. The AC joint was one of Mr. Koeller's pain generators. Prior to the injury, he was not experiencing pain over the left shoulder or over the AC joint. As such, it is my opinion that a rating related to the distal clavicle excision is appropriate.

---

[1] These figures or tables are found in the Fifth Edition of *Guides to the Evaluation of Permanent Impairment*, published by the American Medical Association (AMA), which is referred to colloquially as the "*AMA Guides*" or the "*Guides*."

Dr. Taylor also explained that he did not apply a 25% modifier from Table 16-18 of the *AMA Guides*, which would lower the impairment rating for a distal clavicle excision from 10% to a 3%, because he believes that Table 16-27 was inadvertently listed as one of the tables to which the modifier should be applied.

> I have attended numerous ABIME training courses specific to the 5th Edition, and each time it was evident that Table 16-27 is a stand-alone Table (i.e., no modifier used).  If one looks closely at the Tables for which a modifier is used (e.g., Table 16-20 on page 500), there is an asterisked footnote below each table that requires the use of a modifier, and reads, "Multiply by the relative value of the joint (Table 16-18) to determine the joint impairment."  This footnote is not included under those tables where the modifier should be not be used, such as Tables 16-25, 16-26, and 16-27 (all of which fall between 16-19 and 16-30).  Also the explanatory paragraphs for the asterisked Tables mention the need to use a modifier, but it is not mentioned in the explanatory paragraphs for Table 16-27 (see section 16.7b, page 505).  In my opinion, these findings argue against the use of a modifier for Table 16-27.
>
> . . . .
>
> Also, not using the modifier is internally consistent with other sections of the *Guides* when similar impairments are assigned elsewhere for similar procedures.

Dr. Brian Crites, an orthopedic surgeon who reviewed Koeller's records, echoed the belief that Koeller's distal clavicle excision resulted from the work injury.  Dr. Crites opined that Koeller's work injury

> was a direct causal factor in causing a permanent material aggravation to the pre-existing left shoulder acromioclavicular (AC) joint arthropathy.  Per the clinic note on 1/9/23 he was having a significant AC joint pain in October after the injury.  This material aggravation necessitated the need for a distal clavicle excision which was indicated and appropriately performed by Dr. Bollier.  The left distal clavicle excision/excisional arthroplasty was a necessary part of the surgery as he was having significant AC joint related symptoms.

Dr. Crites agreed with Dr. Bollier's 6% impairment for loss of range of motion but opined that the value "is only a portion of what should be assigned."  Citing

Table 16-27 on page 506 of the *AMA Guides*, Dr. Crites assigned a 10% impairment to the left upper extremity for having a distal clavicle resection. Combining the impairment ratings, Dr. Crites assigned Koeller a 15% impairment to the left shoulder, which is equivalent to a 9% whole-body impairment. Dr. Crites assigned Koeller a 5% impairment to the left arm for the biceps tenotomy/release, which is equivalent to a 3% whole-body impairment. Combining the values, Dr. Crites found Koeller's work injury resulted in a 12% whole-body impairment.

After an arbitration hearing, a deputy workers' compensation commissioner adopted Dr. Taylor's opinion on Koeller's left shoulder impairment as the most accurate. The deputy commissioner agreed that Koeller's distal clavicle resection should be included in determining his impairment because it "was a documented part of Koeller's left shoulder surgery," and so it was rational to conclude it would cause impairment. Because no medical record shows that Koeller sought treatment for AC joint osteoarthritis before the work injury, the deputy commissioner concluded that the work injury materially aggravated it. She also found Dr. Crites's opinion was not persuasive because he only performed a records review, even though the *AMA Guides* state that an expert must perform an examination of a claimant to provide a valid impairment rating.

> Of the three expert opinions presented, only Dr. Taylor's includes a complete review of Koeller's treatment records, a well-documented physical examination, and an impairment rating for the distal clavicle excision. Given this, Dr. Taylor's opinion on permanent impairment is adopted, with some modifications . . . .

Those modifications relate to Dr. Taylor's failure to apply the 25% modifier listed in Table 16-27 to Koeller's distal clavicle excision. The deputy commissioner noted that in past decisions, "the workers' compensation commissioner determined that

under the *AMA Guides*, Fifth Edition, a rating physician must apply the 25 percent multiplier contained in Table 16-18 to any rating for a distal clavicle resection." Applying the multiplier to the other findings Dr. Taylor made, the deputy commissioner assigned Koeller a 13% impairment rating of the upper extremity. Finding a causal connection between Koeller's work injury, the ongoing numbness in his arm and fingers, and a need for treatment with a nerve or brachial plexus specialist, the deputy commissioner also approved Koeller's request for alternate medical care.

Koeller and Cardinal each appealed the arbitration decision. The workers' compensation commissioner affirmed the impairment rating and alternate medical care. Both parties applied for judicial review. After a hearing, the district court affirmed the workers' compensation commissioner's appeal decision.

**II. Scope and Standard of Review.**

Our review of agency decisions is governed by Iowa Code section 17A.19 (2025). "We apply the standards set forth in Iowa Code chapter 17A in our judicial review of agency decision-making to determine whether our conclusion is the same as the district court." *Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 242 (Iowa 2018). The district court may properly grant relief if agency action prejudiced the substantial rights of the petitioner and that action falls under the criteria of section 17A.19(10). *Id.* If we reach the same conclusion as the district court, we affirm. *Id.*

The following principles also apply to the claims raised on appeal:

We review the commissioner's legal interpretations of Iowa Code chapter 85 for errors at law rather than giving deference to those interpretations. We accept the commissioner's factual findings when

supported by substantial evidence. Substantial evidence means that we must affirm the commissioner if there is enough evidence to support the finding, even if we may draw different conclusions from the record. Under Iowa Code section 17A.19(10)(f), we may reverse, modify, or grant other appropriate relief when important findings of a workers' compensation decision were not supported by substantial evidence. It is a well-established rule that chapter 85 is liberally construed in favor of the employee, with any doubt in its construction being resolved in the employee's favor.

*Mid Am. Constr. LLC v. Sandlin*, 2 N.W.3d 838, 846 (Iowa 2024) (cleaned up).

### III. Permanent Partial Disability Award.

Both Koeller and Cardinal challenge the permanent partial disability rating assigned by the agency. As the district court noted, "all of the experts agree that Koeller was entitled to [permanent partial disability] benefits of some sort; the question is just one of amount." Koeller argues that the agency erroneously interpreted and applied Iowa Code section 85.34(2)(x) (2022) to adopt Dr. Taylor's impairment rating but reduce it from 19% to 13%. In contrast, Cardinal claims that substantial evidence supports the 6% impairment rating found by Dr. Bollier.

Iowa Code section 85.34(2) addresses how the workers' compensation commission determines the extent of a worker's permanent partial disability. It states that "the extent of loss or percentage of permanent impairment can be determined by use of the guides to the evaluation of permanent impairment, published by the [AMA], as adopted by the workers' compensation commissioner by rule[2] pursuant to chapter 17A." Iowa Code § 85.34(2). Section 85.34(2)(n)

---

[2] Iowa Administrative Code rule 876-2.4 states:

> The Guides to the Evaluation of Permanent Impairment, Fifth Edition, published by the [AMA] are adopted for determining the extent of loss or percentage of impairment for permanent partial disabilities and payment of weekly compensation for permanent partial scheduled injuries under Iowa Code section 85.34(2) not

governs the loss of a shoulder. Section 85.34(2)(x), which applies to "all cases of permanent partial disability described in paragraphs 'a' through 'u,'" further states: "Lay testimony or agency expertise shall not be utilized in determining loss or percentage of permanent impairment . . . ."

The deputy commissioner adopted Dr. Taylor's opinion that Koeller has 9% impairment of the upper extremity for loss of range of motion and 1% impairment of the upper extremity for supination weakness in Koeller's elbow/forearm. The deputy commissioner also accepted Dr. Taylor's opinion that Koeller's distal clavicle excision is related to his work injury. But the deputy rejected the 10% impairment rating Dr. Taylor attributed to the excision, along with his arguments against applying the 25% multiplier in Table 16-18. In doing so, the deputy commissioner cited the workers' compensation commissioner's appeal decision in *Jay v. Archer Skid Loader Service, LLC*, No. 19003586.01, 2022 WL 17078713, at *6–7 (Iowa Workers' Comp. Comm'r Aug. 23, 2022), which addressed whether the *AMA Guides* require application of the 25% modifier in calculating impairment for a distal clavicle excision. The commissioner noted that the *AMA Guides* direct physicians "to assign a rating for a distal clavicle excision" and "also require application of a 25 percent multiplier." *Jay*, 2022 WL 17078713, at *7.

The deputy commissioner rejected Koeller's attempts to distinguish the facts of *Jay* and found its directive to use the 25% multiplier binding.

> While courts have indicated the agency should not summarily reject expert testimony when it is the only medical evidence presented, the Commissioner remains the finder of fact and has a duty to reject expert testimony when there are valid reasons to do so. Under the

involving a determination of reduction in an employee's earning capacity.

statute, failure to comply with the language of the *AMA Guides* remains a valid reason to reject an expert opinion. See Iowa Code § 85.34(2)(x). Additionally, the opinions offered by Koeller do not distinguish his injury from that presented in *Jay*, i.e., they do not argue that the multiplier should not apply in this instance because of some fact particular to Koeller's injury and/or his resulting medical treatment. Instead, they simply argue for an interpretation of the *AMA Guides* that is contrary to that already adopted by the Commissioner. That request is outside the scope of the undersigned's authority.

> *Jay* is the controlling legal authority in this case, and it states that the multiplier must be used when calculating impairment for a distal clavicle excision. Applying the multiplier as directed, results in a rating of 2.5 percent for Koeller's distal clavicle excision. According to the *AMA Guides*, this rating must be rounded to the nearest whole number. Using the combined values chart at page 604, Dr. Taylor's opinion results in an impairment rating of 13 percent of the upper extremity.

The commissioner affirmed the arbitration decision.

Koeller contends the agency violated section 85.34(2)(x) by adopting the impairment rating assigned by Dr. Taylor "with some modifications." He alleges that the modifications were based on agency expertise, which section 85.34(2)(x) specifically forbids. The district court disagreed, finding the agency rejected Dr. Taylor's opinion because he failed to follow the *AMA Guides*:

> While Dr. Taylor is certainly entitled to disagree with the *AMA Guides*, he cannot ignore them for the purpose of a workers' compensation claim. It is true that expert opinions play a fundamental role in workers' compensation law, but their influence is not unlimited. An expert cannot opine their way out of the plain language of the *AMA Guides*, adopted in both statute and regulation, which specifically state that resections in the upper extremity are subject to a 25% multiplier. It requires no lay testimony or agency expertise to reach this conclusion. Here the Commissioner was faced with a quandary, because none of the expert opinions provided accounted for the [distal clavicle excision] and correctly applied the *AMA Guides*. The best option available was to make a small correction relying on the plain language of the *AMA Guides*. To do otherwise would contradict precedent and the plain meaning of the statute.

We agree.  Because we reach the same conclusion, we affirm on this claim.

We turn then to Cardinal's claim that Dr. Bollier's impairment rating should be accepted in whole rather than Dr. Taylor's.  Cardinal focuses on the qualifications of each doctor, Dr. Bollier's familiarity with the injury as Koeller's treating physician versus Dr. Taylor's one-time examination of him, and Dr. Taylor's intentional decision to disregard the *AMA Guides* regarding the 25% multiplier.  The problem with Cardinal's argument is that it cannot show a lack of substantial evidence for the agency's finding on Koeller's impairment.  Instead, it provides an alternative conclusion that the evidence may also support.  But whether the evidence could support a different conclusion is irrelevant.  *See Bridgestone Americas, Inc. v. Anderson*, 4 N.W.3d 676, 681 (Iowa 2024).  The question is whether substantial evidence supports the findings made by the agency when viewing the whole record.  *Id.*  The deputy commissioner provided ample reasons for adopting Dr. Taylor's impairment rating subject to the adjustment for the multiplier.  Because the agency's determination that Koeller's work injury resulted in 13% impairment rating of the upper extremity did not violate Iowa Code section 85.34 and is supported by substantial evidence, we affirm.

**IV. Alternate Care Award.**

Cardinal also challenges the determination that Koeller is entitled to alternate medical care to treat the brachial plexus.  Although Cardinal stipulated that Koeller suffered a work-related injury to his left shoulder, it contends the brachial plexus, which connects the shoulder and arm to the spinal cord, falls outside that definition.  It claims that Koeller should have pled an injury to the brachial plexus, cervical spine, or whole body, and his failure to do so places an

award for treatment of the brachial plexus outside the deputy commissioner's authority.

To the extent that Cardinal is arguing that Koeller failed to provide proper notice of the nature of his injury, the supreme court has held that

> an application for arbitration is not a formal pleading and is not to be judged by the technical rules of pleading. As one commentator has noted, "The petition for arbitration may state the claims in general terms and technical or formal rules of procedure need not be observed. The key to pleading in an administrative process is nothing more than opportunity to prepare and defend. The employer is to be afforded a substantive right to be at least generally informed as to the basic material facts upon which the employee relies as a basis for compensation."

*Univ. of Iowa Hosps. & Clinics v. Waters*, 674 N.W.2d 92, 96–97 (Iowa 2004) (cleaned up) (footnote omitted). Koeller's petition alleged an injury that affects his "left shoulder, left arm," and Cardinal concedes that "symptoms of a brachial plexus injury may involve the shoulder, arm and hand."

Cardinal also contends that Koeller failed to meet his burden of showing that his need for an evaluation with a brachial plexus specialist is related to the work injury. Whether an employee sustained an injury arising out of and in the course of their employment is fact question vested in the discretion of the worker's compensation commission. *Bridgestone Americas,* 4 N.W.3d at 681. The deputy commissioner noted that Koeller's medical records establish that he experienced numbness and tingling down his left arm and into his fingers after the work injury. As a result, the deputy commissioner determined that the numbness and tingling was causally related to Koeller's work injury. Dr. Bollier noted in the record of a May 2023 appointment that Koeller "may need evaluation in the future regarding his continued symptoms of numbness and tingling down the arm. If URIs further

evaluation would recommend evaluation with a nerve or brachial plexus specialist. This would be related to his original work injury." Because none of the medical care he was provided had addressed the numbness and tingling at the time of the arbitration hearing, substantial evidence supported granting his request for alternate medical care. We affirm.

**V. Conclusion.**

Because neither party has proved the agency erred in awarding Koeller workers' compensation benefits, we affirm the district court's ruling on judicial review.

**AFFIRMED.**

Buller, J., concurs; Langholz, J., dissents in part and concurs in part.

**LANGHOLZ, Judge** (concurring in part and dissenting in part).

Imagine a cookbook chapter on cakes and frostings. In its introduction, it includes the general guidance, "to bake a sheet cake instead of a double-layer cake, reduce the frosting ingredients by half." Later on, after many recipes for double-layer cakes and companion frostings, it includes a recipe for "The World's Most Delicious Pumpkin Sheet Cake with Cream Cheese Frosting." Should a baker halve the frosting ingredients in this recipe? If he does, he will be sorely disappointed by the insufficient frosting. As an ordinary reader would understand, the more specific recipe already expressly tailored for a sheet cake trumps the general conversion guidance in the introduction. And focusing on only the one general instruction rather than the whole text gives an incomplete—and inaccurate—understanding of the cookbook's meaning.

Yet that is essentially what the workers' compensation commissioner did here when interpreting the American Medical Association's *Guides to the Evaluation of Permanent Impairment* ("*AMA Guides*") to determine the percent of permanent impairment of Kevin Koeller's shoulder. Despite a specific provision giving the percentage of upper-extremity impairment for the relevant condition, the commissioner still applied a general provision for converting shoulder-joint-impairment percentages to upper-extremity-impairment percentages—thus improperly reducing the upper-extremity-impairment rating directed by the specific provision. Because this is legal error, I would reverse the commissioner's interpretation of the *AMA Guides* and the resulting impairment rating and benefits award and remand for the commissioner to make a new finding of Koeller's permanent impairment using an accurate interpretation of the *AMA Guides*.

## I.     The Correct Textual Interpretation of the *AMA Guides*

The heart of Koeller's appeal is a dispute over the proper interpretation of the *AMA Guides* provision governing the impairment rating for his "upper extremity following arthroplasty," which—together with other impairment ratings—was used to determine the total impairment rating for his scheduled shoulder injury.  Am. Med. Ass'n, *Guides to the Evaluation of Permanent Impairment* § 16.7b, at 505 (Linda Cocchiarella & Gunnar B.J. Andersson, eds., 5th ed. 2001) [hereinafter "*AMA Guides*"].  All agree that the commissioner was required to use "solely" the *AMA Guides* to determine Koeller's "percentage of permanent impairment."  Iowa Code § 85.34(2)(x) (2022).  So I start with the text of the *AMA Guides*.

The specific provisions governing Koeller's impairment rating are in chapter 16 of the *AMA Guides*, which covers "upper extremity impairment"—in other words, a person's arm or its component units: fingers, hand, wrist, elbow, and shoulder.  *AMA Guides* § 16.1, at 435.  Each section of the chapter covers different types of impairment for one or more of the units.  And key here, section 16.7b and its companion table 16-27 govern "[i]impairment ratings for the upper extremity following arthroplasty of specific joints."  *Id.* § 16.7b, at 505.  For a resection arthroplasty of the distal clavicle—the procedure performed on Koeller's shoulder—table 16-27 dictates a 10% "Impairment of Upper Extremity."  *Id.* tbl. 16-27, at 506 (reproduced here).  Relying

**Table 16-27** Impairment of the Upper Extremity After Arthroplasty of Specific Bones or Joints

| Level of Arthroplasty | % Impairment of Upper Extremity | |
| --- | --- | --- |
| | Implant Arthroplasty | Resection Arthroplasty |
| Total shoulder | 24 | 30 |
| Distal clavicle (isolated) | — | 10 |
| Proximal clavicle (isolated) | — | 3 |
| Total elbow | 28 | 35 |
| Radial head (isolated) | 8 | 10 |
| Total wrist | 24 | — |
| Radiocarpal | 16 | — |
| Ulnar head (isolated) | 8 | 10 |
| Proximal row carpectomy | — | 12 |
| Carpal bone (isolated) | 8 | 10 |
| Radial styloid (isolated) | — | 5 |
| Thumb | | |
| CMC | 9 | 11 |
| MP | 2 | 3 |
| IP | 4 | 5 |
| Index or middle finger | | |
| MP | 4 | 5 |
| PIP | 2 | 3 |
| DIP | 1 | 2 |
| Ring or little finger | | |
| MP | 2 | 2 |
| PIP | 1 | 1 |
| DIP | 1 | 1 |

CMC: thumb carpometacarpal; IP: thumb interphalangeal; MP: metacarpophalangeal; PIP: proximal interphalangeal; DIP: distal interphalangeal.

on these provisions, Koeller's expert thus used a 10% upper-extremity-impairment rating for this part of his calculation of Koeller's total impairment rating.

But section 16.7b is grouped together in section 16.7 with a collection of other sections governing "[c]onditions not previously described that contribute to impairments of the hand and upper extremity," including "bone and joint disorders," "musculotendinous disorders," "tendinitis," and "loss of strength." *Id.* § 16.7, at 498; *see also id.* §§ 16.7a–16.7d, at 499–507. And an introductory provision before these sections provides: "The severity of impairment due to these disorders is rated separately according to Tables 16-19 through 16-30 and then multiplied by the relative maximum value of the unit involved as specified in Table 16-18." *Id.* § 16.7, at 498. That table in turn shows a host of maximum impairment percentages for different units and joints relative to a larger unit, the entire upper extremity, or the whole person. *See id.* tbl. 16-18, at 499 (reproduced here).

**Table 16-18** Maximum Impairment Values for the Digits, Hand, Wrist, Elbow, and Shoulder Due to Disorders of Specific Joints or Units*

| Units and Joints | Unit | Hand | Upper Extremity | Whole Person |
|---|---|---|---|---|
| **Shoulder** | | | | |
| Glenohumeral | — | — | 60 | 36 |
| Acromioclavicular | — | — | 25 | 15 |
| Sternoclavicular | — | — | 5 | 3 |
| **Elbow** | | | | |
| Entire elbow | — | — | 70 | 42 |
| Ulnohumeral | — | — | 50 | 30 |
| Proximal radioulnar | — | — | 20 | 12 |
| **Wrist** | | | | |
| Entire wrist | — | — | 60 | 36 |
| Radiocarpal | — | — | 40 | 24 |
| Distal radioulnar | — | — | 20 | 12 |
| Proximal carpal row | — | — | 30 | 18 |
| **Entire hand** | — | 100 | 90 | 54 |
| **Thumb** | | | | |
| Entire thumb | 100 | 40 | 36 | 22 |
| CMC | 60 | 24 | 22 | 13 |
| MP | 15 | 6 | 5 | 3 |
| IP | 25 | 10 | 9 | 5 |
| **Index and middle** | | | | |
| Entire finger | 100 | 20 | 18 | 11 |
| MP | 50 | 10 | 9 | 5 |
| PIP | 30 | 6 | 5 | 3 |
| DIP | 20 | 4 | 4 | 2 |
| **Ring or little** | | | | |
| Entire finger | 100 | 10 | 9 | 5 |
| MP | 50 | 5 | 5 | 3 |
| PIP | 30 | 3 | 3 | 2 |
| DIP | 20 | 2 | 2 | 1 |

*% Impairment of (column group header)*

* Each value is related to the next larger units and the whole person

For example, the acromioclavicular joint of the shoulder—which is the joint involved in Koeller's procedure—is listed on table 16-18 with a maximum 25% impairment of the upper extremity and maximum 15% impairment of the whole person. *See id.* An impairment percentage for just that joint would thus be converted to an upper-extremity impairment by multiplying the joint percentage by 25%—the maximum

percentage for that joint in the table, also sometimes referred to as the "modifier." And so, relying on these general provisions, the commissioner held that he had to apply that modifier to Koeller's 10% upper-extremity impairment rating given by section 16.7b and table 16-27, thus reducing the impairment rating to 2.5% before combining it with other impairment ratings not at issue here.

The commissioner's interpretation of the *AMA Guides* is incorrect. For starters, the 25% modifier is not "the relative maximum value of the unit involved" because the rating provided by section 16.7b and table 16-27 is not the percentage of impairment of just the acromioclavicular joint but the percentage of impairment of the entire upper extremity. The text of section 16.7b is plain that table 16-27 gives "[i]mpairment ratings for the upper extremity." *Id.* § 16.7b, at 505. So too is the text of table 16-27 clear on that point—both in its title ("Impairment of the Upper Extremity After Arthroplasty of Specific Bones or Joints") and its column heading ("% Impairment of Upper Extremity"). *Id.* tbl. 16-27, at 506. And since the impairment rating is already for the upper extremity, the 25% modifier—which table 16-18 specifies to convert an acromioclavicular-joint rating to an upper-extremity rating—has no applicability. Doing so would be like applying that sheet-cake-frosting conversion to a recipe that is already specifically for a sheet cake and its frosting. It should be no surprise then that the example showing an application of section 16.7b and table 16-27 does not apply any modifier from table 16-18 to the upper-extremity-impairment rating set by table 16-27. *See id.* ex. 16-69, at 506.

If there were any doubt about this textual interpretation, it is removed by comparing the rest of section 16-17 to section 16.7b and table 16-27. This broader context shows that many of the other provisions and tables give instructions for

determining impairment ratings for individual joints or digits—not the entire upper extremity as with section 16.7b and table 16-27. *See id.* §§ 16.7a, 16.7c, at 499–508; *id.* tbls. 16-19, -20, -21, -22, -23, -24, -28, -29, -30, at 500–03, 506–07. Applying those provisions results in a percentage of joint impairment or percentage of digit impairment. *See, e.g., id.* tbl. 16-19, at 500 ("% Joint Impairment") (reproduced here); *id.* tbl. 16-20, at 500 ("% Digit Impairment"). And each table—unlike table 16-27— includes an asterisk after the column heading for these

| Table 16-19 Joint Impairment From Synovial Hypertrophy | |
|---|---|
| Description of Joint Swelling | % Joint Impairment* |
| Mild: visibly apparent | 10 |
| Moderate: palpably apparent | 20 |
| Severe: greater than 10% increase in size | 30 |

*\* Multiply by the relative value of the joint (Table 16-18) to determine the joint impairment.*

percentages noting that the appropriate modifier from table 16-18 must be applied to convert to an upper-extremity impairment rating. *See, e.g.*, *id.* tbl. 16-19, at 500 ("Multiply by the relative value of the joint (Table 16-18) to determine the joint impairment."). So too does the text of those sections direct that a modifier from table 16-18 must be applied to convert the impairment rating to an upper-extremity-impairment rating. *See, e.g.*, *id.* § 16.7a, at 502 ("The percentage of impairment is multiplied by the relative value of the joint (Table 16-18) to obtain the upper extremity impairment."). What's more, each of the examples for those sections— unlike the example in section 16.7b—applies a modifier from table 16-18 to calculate an upper-extremity-impairment rating. *See id.* exs. 16-63, -64, -65, -66, at 500–03.

The broader context also shows that the lack of any mention of using the modifier in table 16-27 and its example is not a fluke. Two other tables—just like table 16-27—give instructions for determining an upper-extremity-impairment

rating rather than for only a single joint or digit. *See id.* tbl. 16-25, at 503 ("Upper Extremity Impairment Due to Carpal Instability Patterns"), *id.* tbl. 16-26, at 505 ("Upper Extremity Impairment Due to Symptomatic Shoulder Instability Patterns"). As with table 16-27, neither includes the asterisk directing use of a modifier from table 16-18. *See id.* tbls. 16-25, -26, at 503, 505. And the example given for one of the tables—like the example for table 16-27—does not apply the modifier to calculate the upper-extremity-impairment rating. *See id.* ex. 16-68, at 505. Indeed, the operative text of section 16.7a for both tables also does one better—explaining that each table's percentages of upper-extremity impairment are set with the modifier for the joint involved already baked in. *See id.* § 16.7a, at 502 ("The radiocarpal joint represents 40% of the upper extremity (Table 16-18). Therefore, the grades of mild (20%), moderate (40%), and severe (60%) impairment represent upper extremity impairments of 8%, 16%, and 24%, respectively."); *id.* § 16.7a, at 504 ("The shoulder representing 60% of the upper extremity (Table 16-18), the patterns of occult (10%), subluxating (20%), and dislocating (40%) instabilities represent upper extremity impairments of 6%, 12%, and 24%, respectively.").[3]

Despite all this, the commissioner interpreted the *AMA Guides* to require application of the 25% modifier from table 16-18 to reduce the upper-extremity-impairment rating of section 16.7b and table 16-26. The commissioner gave no

---

[3] Section 16.7b presumably does not include the same detailed explanation about the calculations baked into table 16-27 because table 16-27—unlike tables 16-25 and 16-26—covers twenty bones and joints, each of which would take its own mathematical explanation. Instead, section 16.7b says simply: "Impairment ratings for the upper extremity following arthroplasty for specific joints are listed in Table 16-27 and reflect upgraded information." *AMA Guides* § 16.7b, at 505.

reasoning for this interpretation here because the deputy commissioner considered herself bound by agency precedent and the commissioner affirmed without additional reasoning. But in that prior case—also involving a resection arthroplasty of the distal clavicle like Koeller's—the commissioner cited the general provision at the start of section 16.7 that "[t]he severity of the impairment due to" the conditions covered in section 16.7 "is rated separately according to Tables 16-19 through 16-30 and then multiplied by the relative maximum value of the unit involved as specified in Table 16-18." *Jay v. Archer Skid Loader Serv., LLC*, No. 19003586.01, 2022 WL 17078713, at *7 (Iowa Workers' Comp. Comm'r Aug. 23, 2022) (quoting *AMA Guides* § 16.7, at 498). And then the commissioner summarily concluded that the *AMA Guides* "require application of a 25 percent multiplier. This results in a 2.5 percent impairment for a distal clavicle excision under the plaint text of the AMA Guides." The commissioner did not discuss the rest of the text and context of section 16.7.

If one focused on only the general provision at the start of section 16.7, it is understandable why one might think that the *AMA Guides* always requires application of the modifier. After all, table 16.26 does fall within "Tables 16-19 through 16-30." *AMA Guides* § 16.7, at 498. But it is error to read that general provision in isolation. "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) [hereinafter, *"Reading Law"*]. And

considering all of section 16.7 in context as I do above—rather than stopping with the general provision—the commissioner's interpretation becomes untenable.

To accept it, one must ignore that table 16.26 already gives an upper-extremity-impairment rating rather than a joint or digit rating that would need to be converted with the modifier. One must ignore the omission of the asterisk directing that the modifier be applied. One must ignore that the example given for table 16.26 does not apply the modifier. And one must ignore the consistent contrast on all these points between the provisions giving upper-extremity-impairment ratings and those provisions where the modifier is expressly directed to be applied.

To be sure, the general provision could have been written more clearly to explain how it interacts with table 16.26 and the others that give upper-extremity-impairment ratings and thus have no applicable relative value on table 16.18. But even if some tension remains between that general provision of section 16.7 on one hand and section 16.7b and table 26.26 on the other, section 16.7b and table 16.26 are the more specific provisions and thus must control over the more general provision. *See Reading Law*, at 183 (explaining that under the "general/specific canon" of textual interpretation, "[i]f there is a conflict between a general provision and specific provision, the specific provision prevails" and is "treated as an exception to the general rule"); *Est. of Kahn by Rowe v. City of Clermont*, 22 N.W.3d 252, 262 (Iowa 2025) (applying the canon to reverse the district court's interpretation that relied on a general statute rather than the specific).

Correctly interpreted, the *AMA Guides* thus does not apply a modifier from table 16-18 to reduce an upper-extremity-impairment rating given by section 16.7b and table 16-26. The commissioner's contrary interpretation is wrong.

**II.      Judicial Review of *AMA Guides* Interpretation**

A second question remains: Is Koeller entitled to relief on judicial review for the commissioner's misinterpretation of the *AMA Guides* that resulted in a reduction—from 10% to 2.5%—of his upper-extremity-impairment rating for his shoulder arthroplasty?  Given the requirements of Iowa Code section 85.34(2)(x), I think the answer must be "yes."  But how review of the commissioner's interpretation fits within our grounds for judicial review of agency action under Iowa Code section 17A.19 is still a bit tricky.

 Paragraph "x" of Iowa Code section 85.34(2) is a relatively recent addition to our workers' compensation statute.  *See* 2017 Iowa Acts ch. 23, § 9.  It requires that the "percentage of permanent impairment shall be determined solely by utilizing the guides to the evaluation of permanent impairment, published by the American medical association, as adopted by the workers' compensation commissioner by rule pursuant to chapter 17A."[4]  Iowa Code § 85.34(2)(x).  It also prohibits the use of "[l]ay testimony or agency expertise" when deciding the "percentage of permanent impairment."  *Id.*  Paragraph "x" thus makes it "abundantly clear" that use of the *AMA Guides* is "exclusive" and "mandatory" when deciding functional impairment—unlike the discretionary use of the *AMA Guides* before the paragraph's enactment.  *Laguerre v. JBS USA Holdings, Inc.*, No. 24-2049, 2025 WL 3023022, at *4, 8 (Iowa Ct. App. Oct. 29, 2025).

Koeller argues that the commissioner's decision to apply the modifier— despite Koeller's expert's interpretation of the *AMA Guides* that the modifier should

---

[4] Fulfilling this statutory duty, the commissioner has adopted the fifth edition of the *AMA Guides*.  *See* Iowa Admin. Code r. 876-2.4.

not be applied—violated paragraph "x" for two reasons. First, he contends that the reliance on the commissioner's own interpretation of the *AMA Guides* in prior cases was impermissible use of "agency expertise." Iowa Code § 85.34(2)(x). Second, he contends that his expert's interpretation of the *AMA Guides* is the correct one and thus the commissioner's decision based on a wrong interpretation of the *AMA Guides* was not made "solely by utilizing" the *AMA Guides*. *Id.*

I am skeptical that Koeller's first argument could succeed. It is the commissioner's duty to make factual determinations on contested issues, including an employee's percentage of permanent impairment. *See Sherman v. Pella Corp.*, 576 N.W.2d 312, 322 (Iowa 1998), *abrogated on other grounds by* Iowa Code § 85.34(2)(x). So paragraph "x" is a mandate on the commissioner that such a determination shall be made "solely by utilizing" the *AMA Guides*. *Id.* § 85.34(2)(x); *see also Klein v. Whirlpool Corp.*, No. 1656402.03, 2024 WL 3696768, at *2 (Iowa Workers' Comp. Comm'r July 30, 2024). Complying with that mandate requires interpreting the *AMA Guides* to evaluate whether an expert's opinion on the percentage of impairment is based on a correct interpretation of the *AMA Guides*. *See id.* at *2–4; *Polk Cnty. v. Jones*, 47 S.W.3d 904, 164 (Ark. Ct. App. 2001) (rejecting an argument that the Arkansas workers' compensation commission could not make its own "finding of permanent impairment using the AMA *Guides*" rather than only relying on a physician's rating). Indeed, at times in Koeller's trial and appellate briefing and again at oral argument before our court, he has conceded that the commissioner could correct a clear error in an expert's interpretation of the *AMA Guides*. And we generally expect an agency to be consistent in its interpretations of governing provisions. *See, e.g.*, Iowa Code

§ 17A.19(10)(h) (authorizing reversal of agency "[a]ction other than a rule that is inconsistent with the agency's prior practice or precedents, unless the agency has justified that inconsistency by stating credible reasons sufficient to indicate a fair and rational basis for the inconsistency").  So I fail to see how merely abiding by prior agency precedents on the interpretation of the *AMA Guides* is use of "agency expertise" rather than just following the law.

But we need not resolve this issue here.  *Cf. Harrell v. Denver Findley & Sons, Inc.*, No. 21-0827, 2022 WL 2824746, at *2 (Iowa Ct. App. July 20, 2022) (leaving "for another case" the argument that "when a non-physician commissioner or deputy commissioner uses the [*AMA Guides*] to determine impairment, they necessarily rely on 'agency expertise'—a source forbidden by section 85.34(2)(x)" while instead reversing the commissioner's decision for violating the prohibition on use of lay testimony).  Whatever the scope of the commissioner's authority to interpret the *AMA Guidelines* independently of the expert witnesses making assessments under the guidelines, the commissioner must interpret the *AMA Guidelines* correctly.  Otherwise, the commissioner would not be "utilizing" the *AMA Guides* as required by paragraph "x"—he'd be using his own misinterpreted variation of the *AMA Guides*.  And so I agree with Koeller's second argument that the commissioner violated paragraph "x" by using his erroneous interpretation of the *AMA Guides* here.

Still, that's not quite the end of the analysis.  Judicial review of agency action is limited—and a creature of statute: Iowa Code section 17A.19.  We must defer to the workers' compensation commissioner's factual findings, including his determination of the extent of Koeller's functional impairment, when supported by

substantial evidence. *See* Iowa Code § 17A.19(10)(f), (11)(c); *Sherman*, 576 N.W.2d at 322. On the other hand, because the commissioner has not been delegated general authority to interpret Iowa Code chapter 85, we typically give no deference to his legal interpretations—reviewing for corrections of errors at law. *See Bridgestone Americas, Inc. v. Anderson*, 4 N.W.3d 676, 682 (Iowa 2024).

Neither party gives much attention in the briefing to how we should review the commissioner's interpretation of the *AMA Guides*. But when pressed at oral argument, Koeller suggested it is a mixed question of law and fact—so we can correct textual interpretation errors—while his employer and its insurer advocated for treating it as a factual determination to which we must give deference. I interpret paragraph "x" and the corresponding administrative rule 876-2.4 to essentially incorporate the fifth edition of the *AMA Guides* into our workers' compensation law. *See Klein*, 2024 WL 3696768, at *2 (reasoning that the statute and administrative rule makes the *AMA Guides* "binding law" and that reading and applying its provisions "is akin to an application of the law to the facts of a case"); *Hill v. Am. Med. Response*, 423 P.3d 1119, 1126, 1335 (Okla. 2018) (reasoning that a similar statute "incorporated" the *AMA Guides* "into workers' compensation law" and rejecting many constitutional challenges); Iowa Code § 17A.6(2)–(3) (setting procedures for administrative rules that "adopt[] standards by reference to another publication"). And I see nothing in paragraph "x" that suggests a clear delegation to the commissioner of discretion to interpret the *AMA Guides*—quite the opposite, making the *AMA Guides* mandatory and prohibiting use of agency expertise is a *restriction* on the commissioner's authority.

I would thus treat the commissioner's interpretation of the meaning of the *AMA Guides*—like the one here—as a question of law that we review for corrections of errors at law without giving any deference to the commissioner. *See* Iowa Code § 17A.19(10)(c) (authorizing reversal of agency action "[b]ased upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency); *id.* § 17A.19(11)(b) (directing that the court "[s]hould not give any deference to the view of the agency with respect to particular matters that have not been vested by a provision of law in the discretion of the agency"); *Bridgestone*, 4 N.W.3d at 682; *see also Klein*, 2024 WL 3696768, at *2 ("It would be legally erroneous to ignore the provisions of the AMA *Guides*, Fifth Edition, when reviewing this case."). Such an approach mirrors the general rule that the interpretations of texts are matters of law for the court to decide—not the factfinder—subject to appellate review for corrections of errors at law. *See Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) (reviewing "the construction and interpretation of a contract as a matter of law" when based on the text and context rather than extrinsic evidence).

Of course, many disputes about the proper impairment rating under the *AMA Guides* will be about not the meaning of its provisions but rather the factual assessment of the claimant's condition by medical experts. Such disputes are still subject to substantial-evidence review—same as before the enactment of paragraph "x." *See* Iowa Code § 17A.19(10)(f). But the dispute here is a purely legal question of textual interpretation. So it is proper for us to correct any error in that interpretation on judicial review.

\*　　\*　　\*

Bottom line, the workers' compensation commission erroneously interpreted the *AMA Guidelines* to require use of a modifier from table 16-18 to reduce an upper-extremity-impairment rating given by table 16-26. Koeller is entitled to reversal of that erroneous interpretation and his resulting impairment rating and permanent partial disability award. I would thus reverse the district court and the workers' compensation commissioner on Koeller's appeal and remand for the commissioner to make a new permanent impairment rating consistent with an accurate interpretation of the *AMA Guides*. As the majority holds otherwise, I respectfully dissent from the part of its opinion addressing Koeller's appeal. But I too see no merit in the cross-appeal by Koeller's employer and its insurer. So I concur in the rest of the opinion addressing that cross-appeal.